1                        UNITED STATES DISTRICT COURT
                          DISTRICT OF MASSACHUSETTS
2

3

4    United States of America,      )
                     Plaintiff,     )
5                                   )
                                    )
6    vs.                            )   Case No. 23-cr-10046-PBS
                                    )
7                                   )
     Jason Lebberes,                )
8                    Defendant.     )

9

10   BEFORE:  Magistrate Judge David H. Hennessy

11

12                             Motion Hearing

13

14

15                                  United States District Court
                                    Courtroom No. 1
16                                  595 Main Street
                                    Worcester, Massachusetts
17                                  May 4, 2023

18

19

20

21

22

23                     Marianne Kusa-Ryll, RDR, CRR
                          Official Court Reporter
                       United States District Court
24                      595 Main Street, Room 514A
                         Worcester, MA 01608-2093
25                    508-929-3399 justicehill@aol.com
                   Mechanical Steno - Transcript by Computer

```
1   APPEARANCES:

2   United States Attorney's Office
    Evan D. Panich, Assistant United States Attorney
3   1 Courthouse Way, Suite 9200
    Boston, Massachusetts 02210
4   on behalf of the Government

5   Federal Public Defender Office
    Jessica P. Thrall, Assistant Federal Public Defender
6   55 Sleeper Street, 5th Floor
    Boston, Massachusetts 02110
7   on behalf of the Defendant

8
    Also present:
9
    Kelly Foster, U.S. Probation Officer
10

11

12

13

14
                Proceedings recorded by sound recording
15              and produced by computer-aided stenography

16

17

18

19

20

21

22

23

24

25
```

1                          P R O C E E D I N G S

2              (The following proceedings were held in open court

3    before the Honorable David H. Hennessy, United States District

4    Judge, United States District Court, District of Massachusetts,

5    at the Donohue Federal Building & United States Courthouse,

6    595 Main Street, Worcester, Massachusetts, on May 4, 2023.)

7              (Audio recording begins at 11:09:53 a.m.)

8              THE CLERK:  The U.S. District Court for the District

9    of Massachusetts is now in session, the Honorable David

10   Hennessy presiding.

11             You may be seated.

12             Today is May 4th, 2023.  We're on the record in the

13   matter of United States versus Jason Lebberes.  It's Docket

14   23-cr-10046.

15             Will counsel and probation please state their names

16   for the record.

17             MR. PANICH:  Good morning, your Honor.  Evan Panich

18   for the United States.

19             THE COURT:  Good morning, Mr. Panich.

20             MS. THRALL:  Good morning, your Honor.  Jessica Thrall

21   on behalf of Mr. Lebberes, who is present with me at counsel

22   table.

23             THE COURT:  Good morning, Ms. Thrall.

24             PROBATION OFFICER FOSTER:  Good morning, your Honor.

25   Kelly Foster for Pretrial Services.

1          THE COURT:  And good morning, Ms. Foster.

2          Okay.  The defendant has been admitted to what looks

3     like a -- an inpatient detox program for two weeks in Quincy,

4     Massachusetts; and on that basis, the defendant has moved to

5     reopen the detention hearing that was held in White Plains, New

6     York, before Magistrate Judge McCarthy.

7          The government opposes the motion to reopen

8     essentially on two grounds:  First, that this is not new

9     information; and secondly, arguments that kind of focus on the

10    word material.  3142 provides the hearing may be reopened

11    before or after a determination by the judicial officer at any

12    time before trial if the judicial officer finds that

13    information exists that was not known to the movant at the time

14    of the hearing and that has a material bearing on the issue of

15    whether there are conditions of release that will reasonably

16    assure the appearance of such persons as required and the

17    safety of any other person in the community.

18          Ms. Thrall, why don't I hear you first on the question

19    of whether this is information that was not known to the movant

20    at the time of the hearing.

21          MS. THRALL:  Sure, your Honor.

22          We had provided the transcript from the detention

23    hearing in New York as part of our submissions for this

24    hearing.  I think it's plain from the arguments made by both

25    parties that Mr. Lebberes needed drug treatment and mental

1   health treatment; that this was a factor considered by the

2   probation department there in the Pretrial Services report, and

3   because of how quickly the detention hearing happened in

4   New York, there was no time to do any sort of specific

5   treatment planning for Mr. Lebberes.  There was no treatment

6   plan presented at all, I don't believe.

7          So the -- sort of from an obvious timeline

8   perspective, this placement at the Gavin Foundation simply did

9   not exist at the time of the detention hearing in New York back

10  in, I think, March.  So it's certainly new information, because

11  it was relevant to the considerations by the parties in

12  New York and simply did not exist.

13         Since Mr. Lebberes was transferred up to New -- up to

14  Massachusetts from New York, in speaking with him and thinking

15  about the issues surrounding his detention, a placement in a

16  treatment program seemed to be an incredibly important

17  consideration for any magistrate when evaluating whether he

18  should be released or detained.  So Mr. Lebberes and I actually

19  very closely in conjunction with his girlfriend, who is present

20  in the audience, located the Gavin Foundation as a good fit for

21  his substance abuse and mental health needs.

22         I set up the intake, which happened over Zoom in early

23  April, and almost the same day or the following day the program

24  notified me that having completed the intake of Mr. Lebberes,

25  he was sort of a qualified person, and they would accept him

1      into their program.

2              So all of that is new information that was not

3      presented at the original detention hearing; and because of the

4      ways in which the Pretrial Services' report emphasized

5      Mr. Lebberes's need for treatment certainly would have been a

6      relevant factor.

7              There's a case that I cited in our submissions about

8      this -- this issue of new or material information, and really

9      it sort of -- it's not just that it's new information.  It's

10     information that would have mattered, and that's the connection

11     that we're hoping to show the Court today.

12             THE COURT:  Just before I hear from the government, I

13     appreciate the work that you've done on this and the efforts

14     you've made on Mr. Lebberes's behalf.

15             I looked at the transcript.  It came up in a different

16     context, but Magistrate Judge McCarthy asked defense counsel at

17     the initial appearance in New York whether she wanted a

18     continuance, and Ms. Quinn said, No, I don't want a

19     continuance.  And that just strikes me to the intention with

20     the argument that you're making that because all this happened

21     so quickly none of this could have been addressed there.

22             I mean, look, is it a good thing for a defendant with

23     substance abuse issues to get treatment?  The answer is yes,

24     but I mean, the rules are the rules.

25             MS. THRALL:  Your Honor, I saw that.

1          THE COURT:  Yeah.

2          MS. THRALL:  I saw that, you know, and -- and as an

3     attorney who is often in Attorney Quinn's position --

4          THE COURT:  Right.

5          MS. THRALL:  -- right, having to make these judgment

6     calls, I don't want to be a Monday morning quarterback, okay,

7     about whether I would have done something different in that

8     moment.

9          What Attorney Quinn had at the moment was a Pretrial

10    Services report that was recommending release, and I think a

11    lot of people -- a lot of defense lawyers in that circumstance

12    would not have wanted to wait to do any additional treatment

13    planning when the Pretrial Services department was recommending

14    release, because in those circumstances you may just be sort of

15    furthering the detention of your client when you potentially

16    could get them out that day.

17         So I can see that judgment call.  You know, obviously

18    Judge McCarthy ordered Mr. Lebberes detained, and so if I'm

19    being the Monday morning quarterback, I would say, Well, maybe

20    you should have done that differently, but in the moment

21    Attorney Quinn did not know that.

22         I think it's also relevant that this is -- or for

23    Attorney Quinn and the court in New York, this is a Rule 5 out.

24    This is not a case that they're going to be supervising

25    long-term.  It's going to be transferred to the District of

1    Massachusetts whether Mr. Lebberes is detained or released.

2         So in terms of the real kind of nitty-gritty

3    treatment, planning, and supervision, I can -- I can imagine a

4    situation where either Attorney Quinn or Judge McCarthy may

5    say, let's -- let's sort of -- sorry for all these sports

6    references, but --

7         THE COURT:  That's all right.

8         MS. THRALL:  -- punch this over to Massachusetts and

9    let them kind of sort that out.

10        One of the reasons, and maybe I'm getting too far

11   ahead of myself, but one of the reasons that I personally think

12   that this treatment planning in Massachusetts is a good idea is

13   partly because the case is here, you're here, you know, the

14   probation department's here, who will be responsible for him,

15   everybody's here, but Mr. Lebberes is outside of his sort of

16   known community, and that makes treatment in Massachusetts, in

17   my view, more viable, because the people, the neighborhoods,

18   the community where Mr. Lebberes would be able to get access to

19   drugs, he's now far removed from that, and so we have a sort of

20   space and time separation where in some ways treatment can be

21   more successful, because now you're in Quincy.  You don't know

22   anybody in Quincy, right?  And so I think that there's a lot of

23   reasons that while Attorney Quinn's decision not to ask for a

24   continuance and not to do the work that Mr. Lebberes and I have

25   now done, I can see why that is now probably a mistake, but I

1    don't know that it's a mistake that should -- should be held

2    against Mr. Lebberes now where we have a treatment plan where

3    the Gavin Foundation, frankly, is fantastic, and has a whole

4    host of aftercare possibilities for him that I think that this

5    is a good plan that can be supervised here.  And, frankly, I

6    think there's a better chance of success here.

7        So would I have done it differently?  In hindsight,

8    probably.  But that doesn't mean that this is not still a good

9    option for Mr. Lebberes's release.

10       THE COURT:  That's a fair argument.  You know, I'm

11   going to be guilty of Monday-morning quarterbacking as well

12   when I tell you that it often happens, at least before me,

13   where let's say someone is arrested here out of a warrant out

14   of Maine.  Defendants will often just consent to or waive the

15   detention hearing here so that they can have it in Maine and

16   have an opportunity for a more developed record before the

17   court that's going to continue supervising.  Again, I'm just

18   Monday-morning quarterbacking it as well.

19       Has Mr. Lebberes been through drug treatment before?

20       MS. THRALL:  He has had some drug treatment before,

21   your Honor, and he was using Suboxone at the time of his

22   arrest, but not in a way that was supervised in a treatment

23   setting.  And that is part of what I see as sort of the future

24   plan here.

25       Ms. Foster had emailed me a couple of days ago, sort

1    of saying, well, what happens after 14 days or 21 days?  And

2    what I imagine happening is that the Gavin Foundation is going

3    to make recommendations for what Mr. Lebberes's future

4    treatment looks like.  It could be a sober home.  It could be

5    another program.  It could be something like the Hope House in

6    Boston, where I've had clients transition to.  You know, I

7    think there's a lot of different options, but what's going to

8    be happening is that -- or what we would recommend is that

9    Mr. Lebberes's treatment be sort of merged with and mirrored to

10   any court order.  So whatever the Gavin Foundation recommends

11   as his next phase of treatment is what would be required of him

12   by this Court as a condition of release.

13          So if the Gavin Foundation says, You've been here for

14   14 days, but we think you need another month, then he has to

15   stay there another month.  If the Gavin Foundation says, You've

16   been here for 14 days, and now we're recommending that you go

17   to a sober house, then he has to go to a sober house.

18          And if they recommend that if he is on Suboxone, then

19   he has to do that with a prescription with a provider that's

20   all transparent with the probation department and very closely

21   monitored.

22          When I was working with the Gavin Foundation to set up

23   the intake, I told them, I said, you know, we're not ready for

24   you to find him a bed yet.  That's up to the judge.  And they

25   are sort of waiting for me to tell them whether or not the

1   Court would accept our proposal; and if the Court says no, then

2   we're done.  And if your Honor says yes, then they will find

3   him a bed.  I also don't even know how long that is going to

4   take.

5           I assume it's about at least a week, but potentially

6   longer, and Mr. Lebberes would be detained until the bed became

7   available, and then we would coordinate his release.  But this

8   mirroring of his treatment, planning by the Gavin Foundation to

9   any conditions of release is what I view as sort of the -- the

10  thing that overcomes the government's arguments because of the

11  close monitoring.  Any breakdown in Mr. Lebberes's treatment, a

12  relapse, leaving the program, anything of that nature, is the

13  same as violating the Court's conditions of release and would

14  lead to his immediate arrest.

15          And that's what I think at least for now, as I imagine

16  the beginning stages of a treatment plan for him, that is what

17  would be necessary and appropriate given the seriousness of the

18  case and given the seriousness of his needs.

19          THE COURT:  Mr. Panich.

20          MR. PANICH:  Yes, your Honor.

21          It's really hard to know where to begin here because

22  there's so much I want to respond to.

23          THE COURT:  Let me -- let me take one argument off

24  your plate.

25          MR. PANICH:  Sure.

1          THE COURT:  If -- if we got to the point where it was

2     appropriate to consider this proposal --

3          MR. PANICH:  Yeah.

4          THE COURT:  -- what would happen is he would go in the

5     program, and at the end of what I understand to be 14 days,

6     we're going to have another detention hearing.  If the Gavin

7     Foundation says, everything's fine, he doesn't need any more

8     treatment, he can be just be released, that doesn't bind me.

9     If the Gavin Foundation makes other proposals, those don't bind

10    me either.  There would be a detention hearing.  The charges in

11    this case are extremely serious, and the danger posed by this

12    defendant's release is a very significant one.  I don't think I

13    need to repeat all that Magistrate Judge McCarthy considered,

14    but if that shortens or gives you an idea where to begin.

15         MR. PANICH:  It does actually.  So I guess what you're

16    saying, your Honor, is, you know, supposing he is released from

17    the Gavin Foundation, he completes the program, the

18    Court -- the Court is still going to have to consider, your

19    Honor is still going to have to consider whether there are any

20    conditions of release that can mitigate the danger to the

21    community and the risk of flight that Judge McCarthy already

22    found down in New York.

23         THE COURT:  That's right.  I'm not turning it over to

24    the Gavin Foundation to decide release or conditions of the

25    defendant.

1          MR. PANICH:  So -- so I guess I would agree with your

2     Honor that drug treatment is a good thing, and there's some

3     appeal to this.  From my perspective if, you know, I'm not

4     waiving any arguments about why his completion of a drug

5     treatment program would not be sufficient to mitigate the

6     danger of flight risk.  That having been said, I would still

7     argue that it's not warranted, and here's why.

8          I think, first of all -- I do think there's a

9     3142(f)(C) problem.  These were arguments that were available

10    to him at the time of his initial appearance.  I think, in my

11    experience, defendants ask to be released to drug treatment all

12    the time.  And that is certainly an argument that could be

13    made.  I understand there wasn't a spot specifically found at

14    that point, but I think this is what -- I think your Honor's

15    suggestion that people can take the time, come up with a

16    thoughtful release plan is -- is correct in that this is what

17    people should be doing, particularly in a case like this where

18    the weight of the evidence is strong, the charges are serious,

19    and the presumption of danger of flight risk are pretty clear.

20    I say presumption both in the plea piece aspect of statutory

21    presumption, but also of what the evidence looked like when

22    they searched the defendant's apartment.  And so we should be

23    encouraging the people to do this, because the rules don't

24    envision there being a second bite at the apple.  And we're now

25    talking about a second bite of the apple with respect to a

1   detention hearing, which is not the standard route in this

2   court under the rules, and we're also talking about a second

3   bite at the apple with respect to drug treatment.  And I say

4   that according to the SDMI bail report, Mr. Lebberes also

5   previously tried drug treatment in an outpatient setting.  It

6   was unsuccessful.  He did not complete the program.  He since

7   then has been prescribed Suboxone, while at the same time using

8   opioids, according to the bail report, on a daily basis.

9          So the whole point is Suboxone is to prevent the,

10  frankly, the use of an illicit opioid and -- I mean, I'm just

11  reading this.  I may be misinterpreting it, but it sounds like

12  he was double dipping or he was double dipping at the time of

13  his arrest.  So I have doubts as to whether the treatment

14  program is going to be successful.

15         I also point out that although certainly drug

16  diversion in carceral settings is a problem, he has also been

17  locked up for two months now.  And so I don't even know at this

18  point whether he's even using, if he's getting things, you

19  know, inappropriately from inside sources, who knows what, but

20  I think the presumption is that he's not, and he has been

21  essentially detoxing for two months.

22         So for those reasons, in addition to those that I put

23  forward in my opposition, we continue to oppose the -- the

24  release plan proposed here.

25         THE COURT:  Okay.  Thank you.

1        MS. THRALL:  Your Honor, if I could just clarify about

2   the detox issue?

3        THE COURT:  Sure.

4        MS. THRALL:  The Gavin Foundation has sort of two

5   scenarios.  One is a -- is a true detox.  Someone --

6        THE COURT:  Right.

7        MS. THRALL:  -- in the community.

8        THE COURT:  I understood this to be the next phase.

9        MS. THRALL:  This is the CSS, the community

10  stabilization --

11       THE COURT:  Yes.

12       MS. THRALL:  -- which, I think, is particularly

13  important to the Court's other point about where does he go

14  next.  This CSS is about community stabilization, and so it's

15  about planning and finding resources and having an idea of what

16  happens next.

17       And I wanted to respond quickly to what the Court said

18  about coming back in two weeks after the two weeks is up, but

19  we have no objection to that, and we think -- I had another

20  client released several years ago.  He went to STAR.  It was

21  supervised -- it was a -- Judge Kelley's case in Boston, also a

22  gun case, and he went to STAR, and essentially we did the same

23  thing.  Every time there was a next phase, we came back,

24  presented it.

25       Frankly, the government opposed it every time, and

1    Mr. -- my client Mr. David sort of progressed through with the

2    magistrate reviewing each step.

3              THE COURT:  Right.

4              MR. PANICH:  Can I just ask or ask the Court to

5    inquire, I guess, what the -- what the security measures at

6    this facility would even look like, because there is also the

7    concern that discharge to the drug treatment program would in

8    itself, in that 14-day period, would still present a risk.  And

9    I just don't know sitting here today what measures are in place

10   to -- to mitigate those issues.

11             THE COURT:  Okay.  I'll come back to that in a moment.

12             Ms. Foster, does Probation want to be heard?

13             PROBATION OFFICER FOSTER:  No, your Honor.  I -- I

14   simply would say that it seems to me like -- that Judge

15   McCarthy made her decision and the Pretrial Services officer as

16   well as her supervisor did not -- although they did recommend

17   release in Pretrial Services, there was no drug treatment on

18   the table in -- in New York, and so it would be Monday-morning

19   quarterbacking for me to opine on that.

20             THE COURT:  Right.

21             MS. THRALL:  Your Honor, I'm looking at the transcript

22   again, and I'm just trying to see if -- if Attorney Quinn

23   actually asked for drug treatment --

24             THE COURT:  Well --

25             MS. THRALL:  -- because to Ms. Foster's point it

1    wasn't being recommended as a --

2         THE COURT:  I don't -- I looked at it this morning,

3    and I did not see it there, and that was the second look at it.

4    But she did raise the issue about withdrawal and how painful it

5    was going to be.  I mean, I think it was on everyone's mind

6    that the defendant was going to be challenged in a detention

7    setting.

8         MS. THRALL:  And, your Honor, just, I think when I'm

9    looking at the bail report in New York and seeing sort of parts

10   6 and 7 of the Probation Department's recommendations of, you

11   know, substance abuse or mental health treatment or supervision

12   of those issues, you know, this was not on the table, and I

13   have to believe that having a drug -- a treatment program that

14   would address those concerns of the Probation Department's

15   could only bolster the recommendation for release.

16        THE COURT:  It's a subtle distinction, but I -- I -- I

17   think the fairest reading of this is that everyone was aware

18   that Mr. Lebberes had a drug treatment program; that the

19   defendant was given an opportunity to seek a continuance.  Now,

20   it wasn't for this purpose.  It was because of a different

21   argument that Ms. Quinn, the defense attorney, was making, but

22   I think logically she could have just said, you know, maybe not

23   for that reason, but I'd like to see if there is drug treatment

24   available.  I don't think that's -- that's an unfair reading of

25   the situation.

1          Look, I can inquire into the security measures at

2   Gavin Foundation, but I don't think I can grant the motion.  I

3   just don't think it's information that did not exist.  You

4   know, when I look quickly back at the case law regarding this,

5   one case that I remember a defendant had been released and then

6   a motion to suppress evidence had been denied, and it

7   significantly changed the strength of its case, and so the

8   government came back and moved to detain.  It's those types of

9   things that have not happened that are not -- that don't exist

10  that I think the statute contemplates; otherwise, we would be

11  doing detention hearings kind of in installments, you know.

12  This is where things are at the time of the arrest.  This is

13  where they are two months later.  And in fairness to -- to

14  people, you know, Congress, the representatives of the people,

15  that's not what the statute contemplates.  So I don't think I

16  can grant the motion.

17          MS. THRALL:  Your Honor, if I --

18          THE COURT:  I say that.  I recognize having him in the

19  Gavin Foundation even for two weeks may be -- may be something

20  that helps him.  It may not.  You know, I think people have

21  different experiences in drug treatment, but I think it's

22  neither here nor there.  I think the motion has to be denied

23  under the plain language of 3142(f), but go ahead.

24          MS. THRALL:  Can I -- can I address the --

25          THE COURT:  Yes.

1          MS. THRALL:  -- installment idea?

2          THE COURT:  Yeah.

3          MS. THRALL:  Because, you know, this is a little

4     anecdotal maybe, but, you know, my office and I suspect

5     Probation and the government have been -- had access to a lot

6     of presentations by the magistrate judges around pretrial

7     detention and changing the rates of pretrial detention cases in

8     this district, and one of the things that has been recommended

9     to my office by Magistrate Judge Kelley, who came to our office

10    to present about this was even if your client is initially

11    detained, if you can get them into a program, if you can find

12    something for them that is addressing some of the Court's

13    concerns at the moment of initial detention, that we should be

14    bringing these things back to the magistrate judges, because

15    these are the kinds of developments even after a relatively

16    short period of pretrial detention here, two months, these are

17    the kinds of things that we're being told that the magistrate

18    judges want to see us doing.  And it becomes impossible to do

19    that if the Court takes the perspective that we'll -- we all

20    knew he had a drug issue at the initial -- at the initial

21    detention hearing, and so this isn't a change in circumstance.

22    This isn't something new even when very plainly nobody knew

23    that he was accepted at the Gavin Foundation when this

24    detention hearing occurred.

25          And so if we're being sort of encouraged to find this

1    kind of programming, I don't think we should be relying on a

2    strict reading of 3142 to say, No, you can't do that.

3         THE COURT:  I hear you.  Look, Chief Magistrate Judge

4    Kelley is a very, very good judge, but what she thinks doesn't

5    override what Congress says.

6         I think the situation here is more akin to a situation

7    where someone is denied bail and comes back two weeks later

8    and, says, okay, now my family has agreed to put up $50,000.

9    It's something that could have been done, and, look, I wasn't

10   present when Judge Kelley spoke to your office.  I do

11   appreciate efforts that are being made to increase the release

12   rates.

13        If there's a quarrel with the original decision to

14   detain Mr. Lebberes, obviously he has the right to seek review

15   of it under 3145(b), but in terms of a motion to reopen,

16   notwithstanding your efforts, and they are significant, I just

17   don't find that it's there.  I'd like to be telling you

18   something else.  I think drug treatment is a good idea, but I

19   think my hands are bound.  I agree with the government's

20   interpretation of it, so I'm denying the motion to reopen.

21        Mr. Panich, anything else?

22        MR. PANICH:  Not from the government, your Honor.

23        THE COURT:  Okay.  Ms. Thrall, apart from

24   disappointing you, anything else?

25        MS. THRALL:  No, thank you.

1          THE COURT:  Okay.  And Ms. Foster?

2          PROBATION OFFICER FOSTER:  No, thank you, your Honor.

3          THE COURT:  Okay.  We're in recess.

4          THE CLERK:  Court stands in recess.

5          (At 11:37:55 a.m., the recording ended.)

1                          CERTIFICATE OF OFFICIAL REPORTER

2

3               I, Marianne Kusa-Ryll, Registered Diplomate

4     Reporter and Certified Realtime Reporter, in and for the United

5     States District Court for the District of Massachusetts, do

6     hereby certify that the foregoing transcript is a true and

7     accurate transcription prepared to the best of my skill,

8     knowledge, and ability from the official audio-recorded

9     proceedings in the above-entitled matter.

10

11

12        /s/ Marianne Kusa-Ryll                    5/19/2023

13        Marianne Kusa-Ryll, RDR, CRR                 Date

14        Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25